## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## SEARCH AND SEIZURE WARRANT

I, David Brooks, being duly sworn, depose and state as follows:

### I.    TRAINING AND BACKGROUND

1.    I am employed as a Drug Enforcement Administration ("DEA") Diversion
Investigator. I have served in that capacity since July 2013. I am currently assigned to
the Chicago Field Division, Milwaukee District Office. My duties as a Diversion
Investigator include conducting regulatory, administrative, civil, and criminal
investigations of DEA registrants and the diversion of legitimate controlled substances
into the illicit market. I am knowledgeable of the laws, regulations, and procedures
pertinent to investigations of the diversion of controlled substances to the illicit market,
as well as the techniques employed by DEA registrants to divert controlled substances.
I have written and executed numerous Administrative Inspection Warrants and
participated in Criminal Search and Seizure Warrants involving DEA registrants.

2.    I have completed the DEA Academy for Diversion Investigators at
Quantico, Virginia, which included identification and investigation of controlled
substances. I have also participated in numerous investigations involving violations of
the Controlled Substances Act ("CSA"). I have been involved in undercover
investigations of medical facilities and physicians and their dispensing practices. I have
monitored undercover recordings of undercover cooperators, listened to physician-
undercover "patient" conversations, and reviewed and analyzed whether the

physicians were dispensing controlled substances for legitimate medical purposes within the bounds of a professional medical practice.

3.      This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.

4.      Diversion Investigators are not "federal law enforcement officers," within the meaning of Fed. R. Crim. P. 41(a)(2)(C), and are not authorized by 21 United States Code ("U.S.C.") § 878(a)(2) to execute and serve search warrants. However, Diversion Investigators are authorized to serve as the affiant for a search warrant that is requested by an attorney for the government. As such, my role is limited to serving as the affiant while the undersigned attorney for the government is the applicant requesting the issuance of the warrant, pursuant to Fed. R. Crim. P. 41(b) and (c)(2).

5.      Non-Agent personnel cannot be named as the person to whom the warrant is issued because Fed. R. Crim. P. 41(e)(1) states that the issuing judge "must issue the warrant to an officer authorized to execute it." As such, I have arranged for Drug Enforcement Administration (DEA) Special Agent (SA) Enrique Carlton, who is an authorized "law enforcement officer" to execute the search warrant. I will assist in

the execution of the warrant under the direction and supervision of SA Carlton pursuant to Title 18 U.S.C. § 3105.

6.     Because this affidavit is submitted for the limited purpose of securing authorization for the warrant described below, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrant.

II.     **PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED**

7.     I make this affidavit in support of an application for the issuance of a warrant to search the commercial property described as the medical offices of Dr. David I. Stein, M.D., also known as the offices of Milwaukee Pain Treatment Services ("MPTS"), located at 5400 N. 118th Court, Milwaukee, Wisconsin (further described in Attachment A), including all buildings, structures, storage facilities, and other artifices located at that address, in order to seize fruits, instrumentalities, and evidence related to possible violations of: (1) Title 21, United States Code, Section 841(a)(1) and 846; (2) Title 18, United States Code, Section 1956; and (3) Title 18, United States Code, Section 1347. There is probable cause to believe that fruits, instrumentalities, and evidence of these crimes (further described in Attachments B and C) will be found in a search of the premises.

III.     **PROBABLE CAUSE**

Summary

8.     DEA has been working with federal and state law enforcement partners since July 2018 to investigate Dr. David Stein ("Stein"), his wife, Sharon Stein

("Sharon") (collectively, the "Steins") and MPTS. Over the last eight months, we have interviewed various individuals to get first-hand accounts of Stein's prescribing and the dangers it has created, including: many current and former MPTS patients; several former employees, including five office staff members and three physical therapists, whose tenure at MPTS spans more than a decade; a number of pharmacists who have raised concerns about Stein's prescribing and refused to fill Stein prescriptions; and families of patients who have died of drug overdose while under Stein's care. We have reviewed records made available to us by the Milwaukee County Medical Examiner's Office, which have allowed us to identify patients of Stein who have died of overdoses, many within days of being prescribed opioids by Stein. We have also extensively analyzed Stein's prescribing and Medicare and Medicaid billing records, which show Stein as an extreme outlier in terms of his opioid prescribing practices and provide corroboration for the statements made by patients and employees about his prescribing, billing, and other practices. We have also reviewed documents made available to us by other federal and state agencies documenting their audits, complaints and investigations into Stein, Sharon and MPTS over the years. The interviews and data analysis summarized below reflect only a portion of the evidence we have collected to date.

9.     Based on our investigation, there is probable cause to believe that Stein, conspired with his wife, Sharon and others, to distribute controlled substances outside the course of standard medical practice through his pain management clinic, MPTS, in violation of 21 U.S.C. §§ 841 and 846. There is also probable cause to believe that the

Steins conspired to, and did, execute a scheme to defraud federal health care programs by, among other things, performing (and billing for) unnecessary medical procedures in violation of 18 U.S.C. § 1347, and to believe that the Steins have engaged in financial transactions involving proceeds of these illegal activities with the intent to promote these activities, and in an effort to conceal the nature of these proceeds in violation of 18 U.S.C. § 1956.

10.     The Steins operate their medical practice at 5400 N. 118th Court, Milwaukee, Wisconsin. Medical records available at the clinic will provide evidence of prescriptions of controlled substances without legitimate medical purpose and unnecessary medical procedures fraudulently billed to health care programs. Financial records available at, and related to, the clinic will provide evidence of financial transactions intended to promote, and conceal, unlawful distribution of controlled substances and fraudulent healthcare billing.

11.     Based on my training and experience, and my participation in investigations of the diversion of pharmaceutical controlled substances, I know that medical clinics that employ prescribers of controlled substances, such as MPTS, typically have within their premises "patient records," and I know that such records:

a.          generally purport to document services rendered to patients;

b.          typically include patient files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, patient sign in sheets, billing records, test results, laboratory tests, laboratory results, photographs, x-rays, physician orders, history and physical forms, social worker notes, treatment plans, referrals, consultations, correspondence, patient

contracts, patient information, demographic information, and certificates of medical necessity;

c.        are usually maintained, along with similar records, in the normal course of a medical clinic's daily business activities at the clinic; and

d.        are required to be maintained for a minimum of five years from the date of the last entry in the records.

12.     Employee 3, ████████████████████████████████████ ████ and was interviewed in March 2019, indicated that MPTS maintained copies of patient records dating back to 2007 or 2008.

13.     Based on my training and experience, I have found that the presence or absence of such records and the content of such records is relevant in determining whether controlled substances have been prescribed within the normal practice of medicine and for a legitimate medical purpose.

14.     Based on my training and experiences, business owners like the Steins often keep financial records related to their business at their place of business. These records will be relevant to determining whether the Steins have engaged in financial transactions intended to further or conceal their other unlawful activities. I have reviewed records that indicate that the Steins received documents from their financial institutions at MPTS.

<u>Background of the Business</u>

15.     ████████████████████████████████████████ the Steins began operating at 5400 N. 118th Court, Milwaukee, Wisconsin in the mid-2000s. Prior to that time, the Steins operated out of a smaller office in Milwaukee, at which they

operated a (mostly) legitimate pain-management practice. Shortly after moving to the new space, mounting financial pressures, apparently related to maintaining a larger office space and staff, led the Steins to dramatically change operating practices.

16. ██████████████████████████████████████████ ██████████ at the time of the move to 5400 N. 118th Court, patient volume doubled from 15-20 patients per day to 30-40 patients per day. At times, Stein would see 60 or more patients per day. Another former employee, ████████████████████████████ ██████████ ("Employee 3"), estimated that Stein saw 50 or more patients per day. Typically, this meant that Stein would spend less than 3 minutes with each patient prior to providing them with a controlled substance prescription.

17. Employee 1 and another former employee, Employee 2 ██████████████ ████████████████████████, described similar office procedures aimed at increasing profitability and resulting in unlawful distribution of controlled substances and/or health care fraud. Much of what Employee 1 and Employee 2 have described about the way the office operated during their employment was corroborated by interviews with Stein's patients, complaints received by the DEA from pharmacists, complaints received by state agencies from former employees of the clinic or third-party providers, and data collected regarding Stein's prescribing.

18. Based on my training and experience, the below categories of Stein's practices are red flags that are often seen in medical practices that are operating as pill mills, or places serving as drug distribution centers rather than legitimate medical practices. These practices also suggest that the Steins are performing unnecessary

medical treatments and/or fraudulently billing healthcare programs for medical treatments. These practices show that there is probable cause to believe that the Steins are violating the Controlled Substances Act and committing health care fraud.

*Unusual Patient "Contracts" and Clinic Restrictions.*

19. I reviewed documents obtained from a 2015 Medicaid audit of MPTS, which included contracts MPTS had with patients. In those contracts, patients affirmed that they are not working with law enforcement. The contracts also stated that Stein "bears no responsibility for any illegal or negligent acts...associated with the prescription narcotics."

20. Patients have also reported that Stein requires patients to leave their cell phones in a basket outside the examining room. Employees 1 and 2 confirmed this procedure is due to the Steins' fear of being recorded by patients.

21. On March 26, 2019, case agents interviewed ███████ patient ███. Patient ███ was hesitant to speak to case agents because she said she signed a contract with Stein agreeing not to talk to the police or media about Stein.

22. Numerous other patients interviewed also indicated that they signed documents stating that they were not working with law enforcement.

*Procedures Performed, and Medical Decisions Made, by Unlicensed Staff*

23. Sharon does not have a medical degree or any medical training. Despite that, former employees and patients have routinely described Sharon as being "in charge" and "running the place."

24.     Indeed, during interviews many employees and patients discussed, at length, Sharon's outsized role at MPTS. For example, Employee 1 stated that Sharon routinely reviewed medical charts and made notes directing patient care. Employee 1 also stated that Sharon sometimes overruled Stein's discharge decisions, allowing a patient to return to MPTS after Stein made the medical decision to discharge the patient.

25.     According to Employee 1, Sharon also performed certain medically-related tasks such as starting IV's, removing stitches, preparing patients for epidurals, and conducting radio frequency trigger points. Employee 1 sometimes noticed that although she knew Sharon was performing "trigger point" therapies, Employee 1 was directed to bill those procedures as though Stein had performed them.

26.     Employee 2 also noted that Sharon assisted with some medical procedures, including lumbar disc decompressions, starting IV's, and assisting facet injections.

27.     Other medical professionals were uncomfortable with the level of involvement Sharon had in the medical aspects of the practice. For example, a Nurse Practitioner who worked at MPTS filed a complaint filed with the Wisconsin Department of Safety and Professional Services ("DSPS"), in which she stated that Sharon performed patient procedures, urine screens, dressing changes, and prepared patients for procedures. The Nurse Practitioner also complained that Sharon dictated patient care by, among other things, writing notes on patient files for Nurse Practitioners such as: "do this procedure", "wean down this med", "injection on [date]."

28.     Some patients also expressed discomfort with Sharon's role. For example, Patient███ stated that Sharon removed her stitches and that ███ felt it was painful and that it didn't seem like Sharon knew what she was doing.

29.     According to two former employees, Sharon also performed medical procedures such as epidural injections. For example, Employee 4, who worked at MPTS ████████████████████████████████ stated that Sharon claimed she was a Registered Nurse Practitioner. Employee 4 believed that Sharon was performing epidural injections because Sharon arrived at the office earlier than Stein and patients came in to receive epidurals at times in the morning when it did not appear that Stein was in the office. Employee 4 stated that Sharon said it was okay for her to do the epidurals because she claimed she was a Registered Nurse.

30.     Similarly, Employee 5 worked at MPTS ██████████ Employee 5 had responsibility for, among other things, bringing patients back to examination rooms. During the course of performing those duties, Employee 5 witnessed Sharon do injections. A patient also told Employee 5 that Sharon did the injections.

31.     Sharon also decided what to prescribe and signed prescriptions. Employee 4 stated that she saw prescriptions signed by Sharon using Stein's name. Employee 5 stated that Sharon also decided what type of drug, strength and dosage to prescribe to the patients and Stein followed those decisions.

32.     This is consistent with patient accounts. For example, ████ Patient███, stated that Sharon is the one who writes the prescriptions and gives them to patients as they leave the visit with Stein. Sometimes, the receptionist or Sharon provide ████

children (who drive her to the appointments) with the prescription before Patient ▉ is finished with the visit. ▉Patient▉ described a similar procedure wherein, after a cursory appointment with Stein, Sharon provided ▉ with a prescription on ▉ way out the door.

33.     Sharon was also responsible for making determinations regarding whether to accept someone as a new patient. Employee 1 and Employee 3 both indicated that Sharon made those decisions. And she often made them the choice to accept new patients despite being informed of potentially problematic information about them. For example, Employee 3 stated that she was responsible for researching potential new patients by reviewing their Wisconsin's Prescription Drug Monitoring Program ("PDMP") data[1] and criminal histories. When Employee 3 had concerns about accepting a new patient based on these histories, she relayed those concerns to Sharon, indicating that she did not think the patient was legitimate. Sharon often ignored those concerns and accepted the patient anyway.

*Significant Numbers of Cash-Pay Patients*

34.     Based on my training and experience, pain management clinics that service a large number of cash-pay patients present a red flag indicative of over-prescribing. Most patients who require pain management services have insurance that

---

[1] In June 2010, the Wisconsin State Legislature directed the Pharmacy Examining Board ("PEB") to create a Prescription Drug Monitoring Program, commonly referred to as a "PDMP" (see Wis. Stat. § 450.19). The PEB governs the PDMP, and the Wisconsin Department of Safety and Professional Services ("DSPS") oversees the operation of the PDMP in accordance with the policies established by the PEB. RxSentry is the prescription drug monitoring program used by the DSPS to collect data on monitored prescription drugs that are dispensed in the State of Wisconsin or for patients residing in Wisconsin. The PDMP maintains data regarding controlled substances prescriptions issued and dispensed by DEA registrants.

will cover the cost of visiting a pain management specialist with a small co-pay. But, doctors, like Stein, who over-prescribe and over-bill, often find it difficult to remain within-network at insurance providers. Indeed, Stein was suspended from Medicaid's program in 2016. Such doctors often require patients to pay cash and patients will often choose to pay the large cash fees because doing so ensures that they will reliably and consistently receive opioids without a legitimate medical purpose.

35.     Employees 1, 2, 3, 4, and 5 described MPTS as serving a significant number of cash-pay patients. Many of these patients had health insurance, but paid Stein in cash. Indeed, many of Stein's patients have Medicare or Medicaid (as evidenced by the way in which they pay for their prescriptions at the pharmacy), but choose to pay large amounts of cash to see Stein because they reliably and consistently receive opioids without a legitimate medical purpose.

36.     According to former employees, patients paid between $150 and $300 per visit.

37.     According to Employee 3, Medicaid patients were required to take psychological tests periodically. The tests were expensive, so MPTS charged patients for it over time, at a cost of $70 per month. Self-pay patients did not have to do this testing. When Stein was suspended by Medicaid, he stopped administering these tests. Several patients interviewed by case agents on March 26, 2019 confirmed having to take, and pay for, psychological tests. Some were subsequently referred to a psychologist ███████████.

38.     Being a cash-pay patient also impacted the types of treatment patients received from Stein. For example, according to Employees 1 and 2, cash-pay patients were often not required to participate in injection treatments, which were extremely common (generally required) at MPTS.

39.     Much of this information is corroborated by patient accounts and complaints. For example, on September 9, 2018, the DEA received a complaint from ▮▮, a patient of Stein at MPTS, who was being charged $150-$250 cash per appointment for Suboxone. Patient ▮▮ tried to report side effects and concerns related to a reaction from taking the medication. Patient ▮▮ was told she would have to pay another $150 cash to talk to the doctor, otherwise Patient ▮▮ could not discuss side effects with Stein. The complaint indicated that Patient ▮▮ felt MPTS is a suspicious clinic.

40.     Similarly, Patient ▮▮ who was interviewed on September 11, 2018, explained that some of Stein's patients paid $200 or $300 per visit. Patient ▮▮ paid $150. Patient ▮▮ explained that patients who paid $300 typically did not have insurance--they were just there for the pills. Patient ▮▮ stated that patients in Stein's waiting room asked her to trade her medications, to provide urine for their drug screens, and talked about selling their pills. Online reviews of MPTS include references to patients being asked to sell their pills in the MPTS parking lot.

41.     Patient ▮▮ called MPTS for an appointment in June or July 2018. She was told that MPTS did not accept insurance and that appointments were cash-only, costing $225.

42.     Patient ▮ reported paying $200 for the initial visit and $150 for subsequent visits. Patient ▮ had health insurance. Patient ▮ reported that he had to pay up front with a money order or debit/credit card.

43.     Patient ▮ stopped seeing Stein in 2018. Initially, Patient ▮ appointments were covered by insurance. After some time, however, and without explanation, Stein began charging Patient ▮ $150 per visit. Patient ▮ was required to make payment up front before being seen by Stein. Initially Patient ▮ made these payments in cash, but was eventually required to make the payments using money orders or debit cards.

44.     Patient ▮ stopped seeing Stein in 2018. When she first began seeing Stein she had to pay an $80 co-pay. At the end of her time as a patient, the co-pay had gone up to $150. Initially Patient ▮ could pay in cash, but later Stein required money order payments. Patient ▮ was discharged as a patient by Stein in 2018. He claimed that her urine tested positive for Cocaine. Patient ▮ denies using Cocaine. Patient ▮ stated that she had to pay $150 for the visit at which she was told she was no longer going to be seen as a patient. When she asked for her medical records, she was told the cost would be $100.

45.     ▮ patient ▮ described an ever-increasing set of payments. Initially her copay started at $150 and went up to $175. She also had to pay $75 for pill counts and was recently provided a letter that said that she should look for another doctor and that if she couldn't find one, the costs for her visits would increase again. Patient ▮ also said that if she arrived at an appointment without the full amount of

payment, her appointment would be cancelled and she would be charged a cancellation fee. The payments used to be made in cash and are now money orders. MPTS keeps the entire money order and does not provide a receipt.

46.     ██████ patient ██ reported paying $175 per visit despite being covered by Medicaid.

47.     Stein also used the urine screens to make more cash. For example, Patient ██████ stated that in 2016 Stein changed the way he conducted urine drug screens. Despite having insurance, Patient ████ was required to pay Stein $70 in cash for each test. In 2017, Patient ████ was directed to St. Joseph for the urine drug screens. St. Joseph billed her insurance for those tests. Despite that, Patient ████ was also charged $150 by Stein for the urine tests. When Patient ████ followed up with her insurance company, she was told that her copay for these tests should be between $1-3.

48.     Patient ████ interviewed in November 2018, described being charged $80 for drug tests. When she complained to Stein about having to pay $80 for the drug tests when her insurance was also paying for drug tests, MPTS began charging Patient ████ $60 per month for undergoing psychological tests. Patient ████ stated that she was not given another drug test after she started paying $60 per month for psychological tests.

*Financial Records and Management*

49.     According to Employee 1, Sharon was responsible for the financial management of the business. When the clinic initially began accepting cash, Sharon would collect the cash at the end of the day, put it in her purse, and take it to the bank for deposit. Over time, however, Employee 1 noticed fewer deposits into the company

account, despite the fact that Sharon continued to take the day's cash with her at the end of the night. Employee 1 was told by ████████████ that the Steins had a cash drawer at home. Employee 1 also overheard Sharon telling her nanny to take cash out of the cash drawer. Employee 2 also stated that Sharon took cash from the office home with her.

50.    I have reviewed the DWD records of MPTS from 2010 to 2018. I have also reviewed bank statements showing deposits made to bank accounts of Natalie Stein and Jacqueline Stein (the Steins' daughters). MPTS DWD records show that Natalie Stein has been paid $280,511.19 by MPTS from 2010 to 2018. Those same records show that Jacqueline Stein has been paid $135,536.39 during the same time period. Bank records also show that Natalie and Jacqueline receive even-dollar amount checks from MPTS that do not appear to match up to their payroll payment amounts every month. For example, on June 28, 2013, Natalie Stein received a check for $1,600 from MPTS.

51.    Based on my review of public records, Natalie Stein lives in Manhattan, New York. Jacqueline Stein lives in Paris, France. During my interviews with Employee 1, Employee 1 stated that Steins' daughters sometimes worked in the office during school breaks, doing filing. Employee 1 was unaware of any work that the Steins daughters were (or even could be) doing remotely. Based on my training and experience, and given the nature of the business, it is unlikely that Natalie and Jacqueline Stein are working for the MPTS remotely to earn those salaries and payments. These payments appear, therefore, to be indicative of money laundering.

52.    DWD records and bank records also show that David and Sharon Stein appear to be receive even-dollar amount checks from MPTS that do not appear to correspond to their payroll amounts.

*Lacking Physical Exams*

53.    Based on my training and experience, I know that a doctor spending just a few minutes with a patient prior to prescribing controlled substances is an indication that the doctor is prescribing controlled substances without a legitimate medical reason.

54.    Both Employee 1 and Employee 3 described physical exams by Stein to be extremely short. Employee 3,                                              , said that initial exams lasted approximately 30 minutes, but that subsequent exams were only 1-3 minutes long. Employee 3 was often present for these exams. She stated that Stein never took the patient's vitals or asked patients questions about the medications. If a patient's medication wasn't working or was causing side effects, it was up to the patient to raise the concern. Employee 4 confirmed that patient visits lasted *at most* 10 to 15 minutes.

55.    Patients have confirmed the cursory nature medical visits at MPTS. For example, Patient ███, stated that during her first visit nobody took any of her vitals and Stein did not conduct a physical examination. Instead, Stein only asked her to bend over and touch her toes. After that cursory "examination," Stein told Patient ███ to start receiving epidural shots every other month in order to receive prescriptions. The initial visit lasted 5-10 minutes, after which Patient ███ was given prescriptions for

Percocet and Oxycontin. Patient ▮ stated that every subsequent visit lasted five minutes and she never received a physical exam or had vitals taken.

56. Patient ▮ described a similar visit protocol. She stated that an appointment with Stein lasted only five minutes, during which Stein would ask her to touch her toes and bend backwards for a bit.

57. Patient ▮ was seen by Stein in the summer of 2018. She reported that a nurse took her vitals, did her blood pressure, took her temperature, and weighed her. She was asked about her pain by the nurse. The visit with Stein lasted less than ten minutes. He asked her where her pain was and touched her as she showed him scars on her hands. That was the extent of the examination. After Stein's "examination" he provided Patient ▮ with several prescriptions including prescriptions for Oxycodone, gabapentin, and Lyrica. Patient ▮ only filled the prescription for Oxycodone because it was cheapest.

58. Patient ▮, who stopped seeing Stein in late 2018, stated that his visits with Stein lasted no more than 10 minutes. Patient ▮ never had his vitals taken at the clinic. Patient ▮ visits with Stein would consist essentially of Stein asking Patient ▮ to sit in a chair and lift up his legs. Most of the "examination" related to the range of motion of ▮ lower limbs, even though ▮ injury was to his bicep and rotator cuff.

59. ▮ patient ▮ described Stein as running through patients like a "cattle car." He stated that he spends, on average, ten seconds to one minute with the doctor during his visits.

60.     Patient███, who saw Stein on and off from 2014 to March 2018, reported that visits with Stein would last about 30 seconds. Stein would ask Patient███ to stand on his toes and rock onto his heels. Patient███ vitals were only taken at the initial appointment.

61.     I am aware from reviewing PDMP data and Milwaukee County medical examiner reports that Patient███ saw Stein from February 2014 until his death from drug overdose in September 2017. He filled prescriptions prescribed him by Stein for Oxycodone HCL four (4) days before his death, Pregabalin five (5) days before his death and Morphine Sulfate six (6) days before his death. In March 2019, I interviewed Patient███ father, who reports that he sometimes drove Patient███ to his appointments at MPTS. His father states that he would wait for Patient███ in the car in the parking lot and that Patient███ would return to the car with a prescription in only about five to ten minutes.



*Pay-For-Play: Epidural Injections in Exchange for Opioid Prescriptions*

63.    According to patients, MPTS was known as the place where "shots" were required. This is because Stein required a significant percentage of his patients to get either epidural or facet joint injections or both. The system of injections was essentially a "pay for play" scheme whereby patients would receive opioid prescriptions if they participated in the required injection therapy. According to Employee 2, Sharon would often tell patients who complained about getting injections that she would authorize their prescription for the month, but that "next month you have to get epidurals."

64.    Moreover, almost every single injection provided at MPTS was billed to government payors using two codes: the initial injection code as well as an add-on code. By using the add-on code, MPTS received two payments from the payor for a single procedure; one payment amount is associated with the base code and a separate, additional payment comes as result of the add-on code. Based on my investigation, these add-on codes are typically the exception, rather than the rule. Analysis provided by state agents indicates, for example, that Stein was the top biller to Medicaid of the epidural add-on code in the state of Wisconsin from a review period of March 2015 through March 2018, despite being suspended from Medicaid for the majority of that time period. Stein was paid $32,101 of the total $93,794 paid by Wisconsin State Medicaid for this add-on code during that time period, again despite his suspension from Medicaid payments between July 2016 and the present.

65.    According to Employee 2, patients often complained about having to receive the injections. They continued to accept the injections, however, because it was

the only way to receive prescriptions for opioids. Employee 2 confirmed and emphasized that these shots were a prerequisite to receiving opioid prescriptions.

66. Patient ▇ was interviewed on September 11, 2018. ▇ stated that she went to see Stein in 2013 based on a referral from her primary care physician. Patient ▇ described long lines and a waiting room filled with 25-30 people. She said patients were coming in and out like it was a "drug house." During her first visit, Patient ▇ received prescriptions for Percocet and Gabapentin. Stein also discussed injections with Patient ▇ during her first visit and told her that she would not get her prescription if she did not get the injections. Patient ▇ said that people in the waiting room talked about injections, asking her: "Are you new here? Because Stein is going to want you to get injections."

67. Patient ▇ also described receiving epidural injections and "facet" shots. When she complained to Stein that the shots didn't relieve her pain, Stein insisted that she continue receiving the shots in order to continue receiving the prescriptions and prevent from being discharged by MPTS. Patient ▇ stated that Stein noted in her medical records that her pain was reduced by 50% from the shots even though Stein never asked her if the shots worked and despite the fact that she complained to him that they did not. Patient ▇ stated that at some point she asked Stein to increase the number of 15mg Oxycodone tablets she was taking. Stein did not increase the number, but increased the dosage to 30mg on November 18, 2015. Patient ▇ then again asked to stop the injections, but Stein declined and told her that if she didn't get injections and

do physical therapy she would not receive any more prescriptions. He also told her that she would go into "withdrawal" and "get sick" if she didn't "get pills."

68.    Stein recommended epidural injections to Patient ▉ who was seeing Stein because of fire burns to her hands, back of her head, and back. No previous doctor had ever recommended injections.

69.    Patient ▉ saw Stein on and off from 2014 to March 2018. Patient ▉ allowed Stein to give him shots because Stein told Patient ▉ that he could not get his prescriptions without the shots. Patient ▉ did not have an understanding of what the shots were and did not think they worked.

70.    ▉ patient ▉ described receiving injections that she felt caused more pain than they alleviated. She was also told by her insurance company that the injections were not going to do any good.

*MPTS' Problematic Relationship with Physical Therapists*

71.    ▉ MPTS employed on-site physical therapists prior to 2015. After 2015, MPTS contracted with Alliant Physical Therapy to provide on-site physical therapy services to patients. Employee 2 understood that part of the agreement with the third-party physical therapy company required Stein to refer a certain number of physical therapy patients per week. Employee 4 was responsible for scheduling patients for physical therapy. She was directed to try to get the patients to go to the physical therapists co-located in the MPTS space.

72.    Physical Therapist 1 worked for Stein ▉ He confirmed that many of the patients he saw were not interested in the physical therapy, and

wouldn't do the exercises. According to Physical Therapist 1, these patients seemed to be going through the motions in order to get their pills.

73.    Physical Therapist 1 stated that he thought a significant number of the patients were pill seekers. When patients failed to show up for physical therapy multiple times, Physical Therapist 1 would discharge them. But Sharon and Stein frequently overrode his discharge decisions and allowed the patients to come back to the clinic.

74.    Physical Therapist 1 also stated that many of his patients complained about "surgeries" performed by Stein. Physical Therapist 1 believed that these weren't appropriate and raised concerns with Stein about patients on at least seven (7) different occasions.

75.    Physical Therapist 1 stated that Stein recorded his conversations with Physical Therapist 1 and Physical Therapist 1 believed that Stein also recorded conversations with patients.

76.    Physical Therapist 2 worked at the clinic ██████████████████
██████ left because she thought that working there put her license at risk. Physical Therapist 2 confirmed that patients were required by Stein to do physical therapy in order to get prescriptions and felt that the Steins were more focused on making money than helping patients. ████████████████████████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

██████████████████████████

77.     On other occasions, Physical Therapist 2 noticed that patients would

report that their pain was at level 0 for several weeks in a row. Physical Therapist 2

attempted to address these issues with Stein and to request that Stein reduce the

patient's opioid dosage to allow them to determine whether the opioids were masking

the pain or the patients were getting better. Physical Therapist 2 did not get a response

from Stein and Stein did not change the patient's course of treatment.

78.     ███████████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

79.     Physical Therapist 3 worked at MPTS from ███████  Physical

Therapist 3 stated that Sharon told patients that completing physical therapy was a

prerequisite to getting their opioid prescriptions. Physical Therapist 3 felt that about

half of the patients did not need physical therapy, and she relayed that opinion to

Sharon, who stated that patients must complete the physical therapy regardless. If

Physical Therapist 3 discharged a patient from physical therapy, Sharon would yell

about it.

*Urine Drug Screen Policies and Billing*

80. In addition to being known as the "easier" place to get pills, patients also apparently knew that they could continue to receive prescriptions despite testing positive for other controlled substances on the required urine drug screens.

81. Employee 2 described knowing that patients were falsifying urine drug screens. For example, some patients turned in urine samples that were heated. Employee 2 witnessed hand warmers and condoms in the bathrooms, indicating that patients were bringing in urine to pass the tests. Other times, patients would put what appeared to be crushed up pills in urine to ensure a urine screen would test positive for the opioids they were taking. When Employee 2 informed the Steins of observing these facts, patients would only sometimes be discharged. Other times, these patients were coached by the Steins on what levels needed to be seen in the screens to obtain prescriptions. Still other times, patients would be given prescriptions for opioids despite these facts. According to Employee 1, which patients were discharged after a failed drug screen and which patients were given prescriptions depended largely on the type of payment method. Workers' Compensation patients were almost never discharged for failed drug screens, whereas Medicaid patients were frequently discharged or given piecemeal prescriptions.

82. ████████████████████████████████████████

83.     Employee 4 stated that some patients who had "dirty" urine drug screens were allowed to retest. The determination was made based on Sharon's "mood" or relationship with the patient.

*Excessive Opioid Prescribing*

84.     Both Employee 2 and Employee 1 described Stein as a "legal drug dealer." Both indicated that, in their view, a majority of the patients seen at MPTS were drug seekers and not in legitimate pain. Employee 2 stated that she heard both Stein and Sharon comment that the patients were just going to sell the pills anyway and that they did not care.

85.     Employee 3 echoed these sentiments. She stated that, based on her observations, approximately 30 of the 50 patients seen each day were there just to get pills and not for legitimate reasons. Employee 3 stated that it was obvious to anyone who wasn't "stupid" that these patients were not in pain, and that they didn't care about their treatment, but only about getting prescriptions. Employee 3 stated that Stein was not stupid and knew what was going on. On occasion, when discussing a potential new patient Stein would say things like: "It sounds like this person just wants some pills, but just bring him in anyway and we'll see what happens." Employee 3 also stated that Stein never rejected a patient due to a normal MRI noting that even if the "MRI clearly showed nothing was wrong, we didn't discharge the patient."

86. Employee 4 stated that sometimes family members of patients would call the clinic and report that their family member was selling their prescription medications on the street. Employee 4 did not tell the agents what she did with this information, but the fact that MPTS received reports that their patients were diverting medications provides additional corroboration for the belief held by patients and employees that Stein was prescribing controlled substances outside the course of legitimate medical practice and that he had reason to suspect that doing so was creating the risk of harm to patients and others.

87. Employee 2 also stated that prior to the implementation of PDMP, Stein would start an 18-year old, cash patient without imaging to support a diagnosis on 30mg of Oxycodone. After PDMP was put in place, pharmacists started to question Stein's prescribing and Sharon told Stein to start patients on a lower dose. Employee 2 states that she was in the exam room with Stein and a new patient when Stein told the patient something along the lines that he had to start them on a lower dose, but that he would raise it. Stein told the patient, "Don't worry. I'll get you there."

88. These observations are supported by data, complaints from pharmacists, and patient interviews.

89. Patient ▇▇ described being prescribed opioids on the first visit and subsequently being prescribed a higher dosage of Oxycodone based on her request for more pills. Stein never described the risks associated with a higher dosage. Patient▇▇ described herself as an addict.

90.    Patient ▮▮ described receiving an increased dosage of opioids at her second visit. She was also prescribed a fentanyl patch, but complained that the patch did not stick. Patient ▮▮ described discussions among patients in Stein's waiting room about the amounts they were paying, selling the pills that were prescribed to them, and asking to trade medications. ▮▮ described having other friends who saw Stein who did not take all of the pills they were prescribed but who were required to come back every thirty days to avoid being discharged.

91.    Patient ▮▮ stated he had been seeing Stein off and on throughout the time frame of early springtime 2014 through March of 2018. Though ▮ does have arthritis in his left arm, he initially went to see Stein for "no particular reason." ▮▮ was also prescribed Suboxone. Dr. Stein informed ▮ that the Suboxone was for pain and did not explain to ▮ that Suboxone is used for addiction treatment. On his first appointment, ▮▮ received a prescription for Oxycodone 15mg tablets and/or Percocet, which is Oxycodone with acetaminophen.

92.    Patient ▮▮ saw Stein starting in 2010 following a car accident and continued through 2015. ▮▮ initial prescriptions were for Oxycodone 5mg and were increased to Oxycodone 10mg after two weeks. In addition, ▮▮ was prescribed morphine 15mg tablets. After a year of this medication regime, ▮▮ medication was increased from 10mg to 15mg of Oxycodone and she was prescribed two tablets of morphine 15mg a day instead of the one a day she had been taking. ▮▮ felt that Stein did not care about her health and just wanted to prescribe medications to her and "send her on her way."

93.    Patient ▇ stopped seeing Stein in 2018. Patient ▇. said that he received opioids on his very first visit with Stein and that he continued to receive essentially the same medications on every visit. Patient ▇ said that Stein never discussed potential side effects of the medications and never offered any counseling regarding opioid use. Patient ▇ eventually stopped seeing Stein because he found alternative therapies such as CBD oil and acupuncture and because the medications were not masking the pain. In Patient ▇ opinion Stein "shouldn't be practicing medicine."

94.    Patient ▇ was prescribed a number of medications by Stein, including Fentanyl and Oxycodone. When she was first prescribed Fentanyl in 2013, she was getting 75mcg and 30mg of Oxycodone. In February 2018, Stein began to reduce ▇ dosage of Fentanyl to 50mcg and then 25mcg. Stein did not discuss or explain the decrease. Indeed, Stein never discussed the side effects or rationale for the medications he was prescribing or the dosages. When Stein began to taper ▇ Fentanyl prescription, he also prescribed Pregablin, which ▇ assumed was for withdrawal symptoms. Stein released ▇ as a patient in mid-to-late 2018, claiming that her urine tested positive for Cocaine. ▇ denies using Cocaine. ▇ explained that she suffered withdrawal sickness after her discharge. After ▇ discharge, MPTS called ▇ to return as a patient, but told her that Stein would not prescribe more medications. ▇ now sees a doctor who is strict about opioid prescriptions and following the CDC's morphine milligram equivalents ("MME") guidance. Given this experience, Patient ▇ now realizes that Stein did not follow the CDC's guidance.

95.     Although the CDC guidance with respect to opioid prescriptions is
voluntary, the guidance is based on observational studies and randomized clinical
trials. The guidance is intended to ensure the consideration of safer and more effective
treatments, improvements in patient outcomes, and a reduction in the number of
persons who develop opioid use disorder, overdose, or experience other adverse events
related to these drugs. The comparative analysis of a physician's prescribing relative to
the CDC guidance is, therefore, an important, though not dispositive, data point in the
analysis of whether the physician is prescribing outside the course of legitimate medical
practice.

96.     Patient ██████ has been a patient of MPTS since 2008. Patient ████, recently
stopped taking opioid medicines because his wife expressed concerns that he was
taking too much medication. Patient████ relayed that at each visit with Stein, he
would have to fill out a questionnaire about his pain and whether he needed an
increase in dosages. Patient ██████ reported that generally if he requested an increase in
dosage, he received it.

97.     ████████ Patient ████ described receiving prescriptions for medications she
does not take, including Cymbalta and Lyrica. Patient████ stated that if she does not
get these prescriptions filled, Stein refuses to prescribe her opioid medications until she
does. As a result, she fills the prescriptions and takes the medication to the police
department for disposal. Based on my training and experience, doctors who are
prescribing controlled substances outside of legitimate medical practice may sometimes
also prescribe, and require patients to fill prescriptions for, other medications in

conjunction with the controlled substances in order to appear as though they are treating issues in addition to pain, thereby creating the appearance the appearance of credibility and legitimacy.

98. ████ Patient ████ described initially receiving 30mg of Oxycodone four (4) times per day. ████ primary physician expressed concern with that dosage being high, but Stein never provided any counseling with regard to the high dosage. Patient ████ described having to fill out paperwork at each visit regarding his pain score and to assess whether the medications were working. Stein made no change to the medications regardless of how ████ answered those questions. Recently, Stein has significantly decreased ████ dosage without explanation.

99. I have reviewed Stein's prescribing data, which also shows an excessive level of prescribing. My colleagues at DEA identified several types of Oxycodone that are the most highly diverted: Oxycodone 30mg, 20mg, 15mg and 10mg, each strength without any abuse-deterrent properties.[2] We then worked with other federal authorities to identify the highest prescribers of those Oxycodone pills. Based on Medicaid paid prescription data from January 2017 to May 2018, Stein was the top prescriber of these highly-diverted types of Oxycodone in Wisconsin to Medicaid patients, having prescribed more than twice the amount of Oxycodone as the next most-prolific prescriber in the state. He was also the top Fentanyl prescriber in the state based on the same Medicaid paid prescription data.

---

[2] Some versions of Oxycodone have an extended release, 12-hour abuse deterrent which causes the tablets to be resistant (via physical and/or chemical means) to manipulation and create a barrier to unintended administration, such as chewing, nasal snorting, smoking, and intravenous injection.

100. In reviewing his prescribing across payors, data shows that Stein prescribed Schedule II narcotics, and Schedule IV benzodiazepines in disproportionately high volumes compared to similarly situated practitioners (i.e., other pain treatment doctors). For example, in June 2017, Stein prescribed 49,852 Oxycodone 30mg tablets, 52,892 Oxycodone 15mg tablets, 21,046 Oxycodone 10mg tablets, and 355 fentanyl patches. These numbers are consistent with surrounding months.

101. Stein's PDMP also shows particularly high MME. As of November 2018, Stein's PDMP sorted by patient and prescription date showed that 42% of patients on a particular prescription date received prescriptions with an MME of 180mg MME/day. That is double the amount the CDC directs doctors to avoid prescribing and more than three times the amount that the CDC has determined doubles the risk of overdose.[3]

102. The PDMP analysis also revealed other red flags indicative of a pill mill, such as patients traveling long distances, including out of state, to Stein's office, and patients being prescribed a drug combination known as the "holy trinity" which includes an opiate, a benzodiazepine, and a muscle relaxer such as carisoprodol (Soma). This combination is sought out by drug seekers because of the euphoric high produced when taken.

---

[3] The Centers for Disease Control and Prevention (CDC) publishes a conversion chart that provides conversion factors for various opioids to calculate the MME of doses of that opioid. "Calculating Total Daily Dose of Opioids for Safer Dosage," CDC, available at https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf. For instance, Oxycodone has a conversation factor of 1.5 per mg/day, so taking one 20 mg pill of Oxycodone per day would have a MME/day of 30. A more powerful opioid, hydromorphone, has a higher conversion factor of 4 per mg/day, so a prescription to take three 4 mg pills of hydromorphone per day would equal a MME/day of 48.
"CDC Guideline for Prescribing Opioids for Chronic Pain," CDC, March 18, 2016, available at
https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm#T2_up.

103. The PDMP data also shows a sudden decrease in Stein's Oxycodone 30mg prescribing starting in early 2018. He decreased his prescription volume from approximately 35,332 Oxycodone 30mg pills in January 2018 to 0 Oxycodone 30mg pills by August 2018. At the same time, Stein increased his prescribing of Oxycodone 10mg and 15mg pills. This new prescribing trend indicates that Stein may have begun to reduce prescriptions to more appropriate levels starting in 2018, although conversations with current patients indicate that he continues to prescribe controlled substances outside the course of standard medical practice. The reduction in prescriptions may be explained by correspondence received by Stein as detailed in Paragraph 104, below.

104. According to ▮▮▮▮ patient ▮▮▮▮, Stein received a letter from Dr. Yarbrough, a Medical Director for the Wisconsin State Department of Health Services on January 2, 2018. That letter addressed Patient ▮▮▮▮ Oxycodone prescription, advising that it was a high dose (above 100 MME), which carried risk. The letter advised Stein to review the patients' dosage and explore alternatives. Stein gave a copy of the letter to ▮▮▮▮ and required her to sign a document acknowledging receipt. He also advised her to contact Dr. Yarbrough. ▮▮▮▮ did so and Dr. Yarbrough directed her to have a conversation with Stein. ▮▮▮▮ stated that she believed Stein received similar letters regarding other patients and also had them acknowledge receipt and contact the medical director. ▮▮▮▮ stated that the basis for this belief was that Stein presented ▮▮▮▮ with a form to sign, which led her to believe others had to do the same. This correspondence may be the reason for the sudden decrease in prescriptions seen in to start in early 2018.

*Encouragement to Engage in Political Action*

105.    Similar to ▮▮▮ experience, at least one other patient indicated that they were encouraged by MPTS to contact Governor Walker and/or the Medical Board, to explain the importance of the continuing availability of opioid medications, when new guidance was given regarding opioid prescriptions.

106.    Patient ▮▮ said that when Governor Walker made a statement about opioid abuse and the prescription drug crisis, Stein encouraged patients to call Governor Walker to complain and make sure the patients' voices were heard. Stein told Patient ▮▮ that if the government cracked down, patients wouldn't get their medicine. Stein also asked patients to write letters and post on Facebook regarding their need for opioid prescriptions.

*Concerns Raised by Pharmacists*

107.    On August 18, 2017, pharmacist A.H., at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ spoke with a DEA Diversion Investigator related to her concerns about a prescription by Stein. Pharmacist A.H. stated that Patient ▮▮ previously received a prescription for 42 Oxycodone with acetaminophen 10mg tablets for 14 days, from Pain Management Treatment Center ("PMTC"), Milwaukee, WI (Dr. Christofferson, ▮▮▮▮▮▮▮▮▮▮▮▮▮. The prescription equated to 30mg of Oxycodone daily, which is a Morphine Equivalent Dose ("MED") of approximately 45mg. This dosage was Patient ▮▮ usual prescription. Patient ▮▮ last filled a prescription (described above) on June 29, 2017. The prescription ended approximately 30 days before ▮▮ attempted to fill Stein's prescription. PDMP records

indicated that Patient ▮▮▮ had not filled any other controlled substance prescriptions since the last prescription was issued June 29, 2017. Pharmacists A.H. described Dr. Christofferson and PMTC as being reputable because prescriptions were conservative in dosage amounts, PMTC conducted frequent drug screens, etc. Pharmacist A.H. was familiar with PMTC and their practices. The prescription issued by Stein was for a 60mg daily dose of Oxycodone, which is a MED of 90mg. Not only was this prescription double Patient ▮▮▮ previous dose, but there seemed to be no valid reason for removing the acetaminophen, which helps with pain relief. Because Patient ▮▮▮ had not had a prescription for over 30 days, Pharmacist A.H. was concerned for patient safety; specifically, that an increased dose like this after not taking any medications for approximately 30 days would harm the patient. Pharmacist A.H. stated that Dr. Stein and his pain clinic's reputation was not reputable. Pharmacist A.H. did not know why ▮▮▮ was no longer receiving prescriptions from his usual pain management doctor. Pharmacist A.H. explained to Patient ▮▮▮ that it would be irresponsible to fill Stein's prescription, and for patient safety concerns, would not dispense the Oxycodone.

108.    On October 19, 2017, Pharmacist-in-Charge ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ spoke to a Diversion Investigator about a concern related to a prescription by Stein. The pharmacist stated that a prescription for Oxycodone 15mg tablets, quantity 120, for a 30 day supply, was issued to Patient ▮▮▮ by Stein on September 29, 2017. Patient ▮▮▮ prescription history showed that the last 10 prescriptions dispensed to Patient ▮▮▮ were all issued by Stein for the exact same controlled substance and amounts. These prescriptions were filled at various pharmacies and ▮▮▮▮▮▮▮▮▮▮

███████ noted a pattern of early refills starting. In addition, the payment type switched between Medicaid and private pay (cash). Prior to being seen by Stein, Patient ██ had received similar controlled substance prescriptions from ████████████████

████████████████████████████ Patient ██ had been discharged from ███████ in February 2016. Walgreens noted a 10-month gap in prescriptions between ████████ and Stein. This is considered a "red flag" at the pharmacy because patients who are opioid naïve (that is have not been taking opioid narcotics and/or built up any sort of tolerance) are at higher risks for overdose when issued prescriptions for stronger and/or higher doses of opioids. Pharmacist ████████ stated that doctors should not give an opioid naïve patient the same and/or higher doses of controlled substances regardless of what the previous treating physician prescribed in order to reduce risk of harm to the patient. When Patient ███ showed up to pick up her prescription at Walgreens, Patient ██ presented an ID card, which she claimed to be her son's. Pharmacist ████████ stated that the whole situation was very shady. The name on the ID appeared to be ████ Pharmacist ████████ stated that there was no indication at all that ████ was any relation to Patient ██ Patient ██, claimed to have forgotten her own ID and then became very argumentative. Pharmacist ████ ██ refused to dispense the medications.

109. Multiple patients reported being directed by MPTS not to fill their prescriptions at Walgreens. Some reported that they were asked to sign an agreement not to fill their prescriptions at Walgreens. Some of these patients, however, continued to fill prescriptions at Walgreens because it was convenient for them to do so.

*Calls to the DEA Tip Line*

110.     On May 2, 2018, the DEA received an anonymous complaint stating that
███ has been selling Fentanyl patches every month for approximately 10 years. ███ also
sells Oxycodone 30mg tablets and morphine tablets when she can obtain them. The
complaint stated that ███ goes to Stein's pain clinic in Milwaukee. A DEA Diversion
Investigator queried Stein's PDMP which revealed that Stein prescribed ███ Oxycodone
30mg tablets, Morphine Sulfate 15mg tablets, and Fentanyl 75mcg patches from at least
January 2013, to May 1, 2018.

*Overdose Deaths of Stein's Patients*

111.     The risks outlined by the CDC with respect to prescribing practices such
as those seen in Stein's PDMP data have become a reality for a significant number of
Stein's patients. I have reviewed Medical Examiner reports related to Stein's patients.
Those reports show that over the past four years, at least nine of Stein's patients died
from overdose-related causes. Seven of those patients were prescribed opioids by Stein
less than two weeks prior to their death, with the majority of those filling their
prescriptions just days before their overdose. Based on my training and experience,
these deaths present a red flag that Stein may be prescribing Schedule II narcotics
outside the course of normal medical practice and in violation of the law.

112.     According to the Milwaukee County medical examiner report, Patient ███
died on May 8, 2014 of "[a]cute mixed drug intoxication (Oxycodone, alprazolam)."
The day before her death, Stein had prescribed Patient ███ 120 pills of Oxycodone HCL
30mg and 60 pills of Morphine Sulfate 15mg. The medical examiner report notes that a

"[p]rescription for Oxycodone was found in ▮ bedroom, filled on 5/7/14." The report further notes that "[d]aughter told officers that ▮ sold Oxycodone pills, had previously purchased Xanax 'off the street,' and had attempted suicide three times in the last four years. ▮ mother usually kept the Oxycodone and Morphine bottles and gave her only enough for one week. On 5/7/14, ▮ argued with her mother after picking up the prescription because she wanted to keep the entire bottle. Her mother tired of the argument and let ▮ have it all."

113. According to the Milwaukee County medical examiner report, Patient ▮ died on July 15, 2016 of "Acute Mixed Drug Intoxication (Oxycodone and diphenhydramine)." Two days prior to her death, Stein had prescribed Patient ▮ 120 pills of Oxycodone HCL 30mg. According to the medical examiner report, ▮ mother stated ▮. had a history of over-medicating and was known to take other people's medication. The report further notes that "[m]any empty, unlabeled medication bottles were found on the scene."

114. According to the Milwaukee County medical examiner report, Patient ▮ died on November 6, 2013 of acute Oxycodone intoxication. Five days prior to her death, Stein had prescribed Patient ▮ 120 pills of Oxycodone HCL 30mg and 60 pills of Oxycodone 20mg. The medical examiner report indicates that on the scene was a bottle of Oxycodone 30mg prescribed on November 1 (same date as Stein's prescription) with only six (6) out of 120 pills remaining. Also on scene was a bottle of Oxycodone 20mg prescribed on November 1 (same date as Stein's prescription) with only 21 out of 60 pills remaining.

115.    According to the Milwaukee County medical examiner report, Patient ███ died on December 16, 2016 of probable acute mixed drug intoxication. Eleven days prior to his death, Stein had prescribed Patient ███ 120 pills of Oxycodone HCL and a 30-day supply of Fentanyl. The medical examiner report notes ███ had a history of past overdoses and polysubstance abuse.

116.    According to the Milwaukee County medical examiner report, Patient ███ died on September 16, 2017 of "[a]cute mixed drug (cocaine, fentanyl, morphine) intoxication." Eight days prior to his death, Stein had prescribed Patient ███ 120 pills of Oxycodone HCL 10mg and 60 pills of Morphine Sulfate 15mg, which Patient ███ filled four and six days, respectively, before his death. Stein had also prescribed Patient ███ 75 pills of Pregabalin 150mg approximately one month prior to his death, which Patient ███ filled five days before his death. Cocaine, benzoylecgonine, fentanyl, morphine and Oxycodone appeared in his system. The medical examiner report notes a history of "[n]arcotic abuse; No known PMD; Prescribing physician on medications was Dr. David Stein. Has been prescribed opioids since at least 2013, possibly longer." The report further noted, "Prescriptions for Oxycodone and morphine on scene, and appeared out of order. Both were recently prescribed. A cut white straw was on the desk where he was likely seated, and a second, red cut straw was found in his short's pocket. Girlfriend stated that ███ tended to 'crush the pills to snort them.'"

117.    I interviewed Patient ███ father in March 2019. His father indicated that he would sometimes drive Patient ███ to his appointments with Stein. His father stated

that he would drop Patient ▮, wait in the car, and Patient ▮ would return with his prescription within minutes.

118.     According to the Milwaukee County medical examiner report, Patient ▮ died on June 29, 2016 with no recorded immediate cause of death. Patient ▮ filled two Stein Oxycodone prescriptions four days prior to her death: one written on June 14, 2016 for 120 pills of Oxycodone HCL 15mg and a second written on June 25, 2016 for 30 pills of Oxycodone 10mg. The medical examiner report notes that "[m]ultiple new and old prescription bottles, inhalers, and diabetes needles found on scene in ▮ bedroom. A Walgreens prescription information sheet was recovered for a bottle of 120 count Oxycodone, but the bottle was never found. Police obtained and searched ▮ phone, noting multiple old text messages were received that alluded to ▮ giving pills to others." The medical examiner indicates that on June 29, 2016, the Medical Examiner's Office "spoke with Dr. Stein, who was initially uncooperative and borderline hostile. A second MEO representative spoke with Dr. Stein that same day. Dr. Stein provided medical records, which indicated that ▮ was regularly prescribed Oxycodone, Oxycontin and Lyrica for chronic neck pain. ▮ mother stated that one of her daughter's friends told her that ▮ had been snorting her prescription medications, that she was 'constantly not feeling well' and had too many doctors."

119.     According to the Milwaukee County medical examiner report, Patient ▮ died on December 8, 2016 of "acute drug intoxication (Oxycodone, diazepam)." On December 6, 2016, two days before his death, Stein issued Patient ▮ a prescription

for 120 pills of Oxycodone 15mg. Patient ▉ also received prescriptions from another doctor for Zolpiedem Tartrate and Alprazolam the day before his death. Notes from the medical examiner report indicate that various medication bottles appeared on the scene as well as "a cut plastic drinking straw noted on the table." Patient ▉ daughter reported that her father "would sell his medications, and buy and sell other kinds of pills," and "had used cocaine, crack, heroin, and used pain pills." She "last saw her dad on the evening of 12/7/2016, he had been driving around with a friend 'making deals.'"

### III. PROCEDURES FOR SEARCHES OF ELECTRONIC DEVICES

120. As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the premises, in whatever form they are found, including but not limited to medical records for Stein's patients. One location where the records might be found is stored on a computer's hard drive or other storage media, as described in Attachment B. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

121. I submit that if a computer or storage medium is found on the premises, there is probable cause to believe the records described in Attachment B will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for

years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file–for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e. Based on my training and experience investigating physicians, in almost every medical practice some manner of computer system is utilized, whether to manage patient medical records, save prescription histories, or handle patient billing needs, and thus there is reason to believe that there is a computer system currently located on the premises, and that the computer system is storing evidence related to the offenses under investigation.

122. This application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

123. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well:

a. Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

contextual information necessary to understand the evidence described in
Attachment B also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a computer was used, the
purpose of its use, who used it, and when, sometimes it is necessary to establish
that a particular thing is not present on a storage medium. For example, I know
from training and experience that it is possible that malicious software can be
installed on a computer, often without the computer user's knowledge, that can
allow the computer to be used by others, sometimes without the knowledge of
the computer owner. Also, the presence or absence of counter-forensic programs
(and associated data) that are designed to eliminate data may be relevant to
establishing the user's intent. To investigate the crimes described in this warrant,
it might be necessary to investigate whether any such malicious software is
present, and, if so, whether the presence of that malicious software might explain
the presence of other things found on the storage medium. I mention the
possible existence of malicious software as a theoretical possibility, only; I will
not know, until a forensic analysis is conducted, whether malicious software is
present in this case.

    124.   Searching storage media for the evidence described in Attachment B may

require a range of data analysis techniques. It is possible that the storage media located

on the premises will contain files and information that are not called for by the warrant.

In rare cases, when circumstances permit, it is possible to conduct carefully targeted

searches that can locate evidence without requiring a time-consuming manual search

through unrelated materials that may be commingled with criminal evidence. For

example, it is possible, though rare, for a storage medium to be organized in a way

where the location of all things called for by the warrant are immediately apparent. In

most cases, however, such techniques may not yield the evidence described in the

warrant. For example, information regarding user attribution or Internet use is located

in various operating system log files that are not easily located or reviewed. As

explained above, because the warrant calls for records of how a computer has been

used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

125. Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

b.       The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.       Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.       Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

126.    In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in this warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence. If computers or other digital devices are found in a running state, I am requesting that the agents be authorized to acquire evidence from the devices prior to shutting the devices off. In addition, in the execution of this warrant, the agents may seize all computers and computer-related media to be searched later by a qualified examiner in a laboratory or other controlled environment.

127. I recognize that not all of Stein's prescriptions were illegitimate and that he is likely to have many legitimate pain management and other patients. I also recognize that Stein's clinic is a functioning medical business with employees and patients, and that a seizure of the clinic's computers may have the unintended effect of limiting Stein's abilities to provide service to legitimate patients. In response to these concerns, the agents who execute the search anticipate taking an incremental approach to minimize the inconvenience to Stein and his legitimate patients and to minimize the need to seize equipment and data. It is anticipated that, barring unexpected circumstances, this incremental approach will proceed as follows:

a. Upon arriving at the premises, the agents will attempt to identify a system administrator of the network (or other knowledgeable employee) who will be willing to assist law enforcement by identifying and copying paper and electronic copies of the things described in the warrant. The assistance of such an employee might allow agents to place less of a burden on the clinic than would otherwise be necessary. Copying or imaging of all patient medical files will nevertheless be necessary, as I know from my investigations of other doctors involved in criminal activity and medical violations that patient files can contain evidence that is only identifiable by a medical expert and often individual actions are best understood in the context of all patients treated by a particular physician.

b. If the employees choose not to assist the agents, the agents decide that none are trustworthy, or for some other reason the agents cannot execute the warrant successfully without themselves examining the clinic's computers, the agents will attempt to locate the things described in the warrant, and will attempt to make electronic copies of those things. This analysis will focus on things that may contain the evidence and information of the violations under investigation. In doing this, the agents might be able to copy only those things that are evidence of the offenses described herein, and provide only those things to the case agent. Circumstances might also require the agents to attempt to create an electronic "image" of those parts of the computer that are likely to store the things described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors

and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The agents or qualified computer experts will then conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date. If the agents successfully image the clinic's computers, the agents will not conduct any additional search or seizure of the clinic's computers while on site.

c. If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the company's computer system that the agents believe must be seized to permit the agents to locate the things described in the warrant at an off-site location. The seized components will be removed from the premises. If employees of the clinic so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the clinic's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

d. Specifically with respect to patient medical records stored on the premises, in whatever form, I am requesting that the copying and imaging of these files be conducted offsite because of the anticipated volume of medical records based on my training and experience with similar investigations. I am specifically requesting that all patient files be seized in order to have all or selected medical records reviewed by an expert in whichever medical field is considered appropriate for the listed medical diagnosis. However, the agents executing the search warrant will attempt to determine the patient schedule and prioritize the copying or imaging of the medical files for the patients with the first scheduled visits so as to minimize any disruption to the legitimate medical services Stein provides.

## V. CONCLUSION

Based upon the foregoing and upon my training and experience, I submit that there is probable cause to believe that the premises described as the medical offices of Dr. David I Stein, M.D., also the offices of Milwaukee Pain Treatment Services., located at 5400 N. 118th Court, Milwaukee, Wisconsin, all buildings, structures, storage facilities, and other artifices located at that address, contains fruits, instrumentalities, and evidence related to possible violations of Title 21, United States Code, Section

841(a)(1) and 846, United States Code, Section 1956, and Title 18, United States Code,

Section 1347.

I swear under penalty of perjury that the foregoing is true and correct.

David S. Brooks
Diversion Investigator, Drug Enforcement Administration

Sworn to before me this
27th day of March, 2019.

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF WISCONSIN

## ATTACHMENT A

The premises to be searched is the business of the Milwaukee Pain Treatment Center: 5400 N. 118th Court, Milwaukee, WI 53225. The location is located South of Silver Spring Drive and West of I-41. The premises is a single story, 11,000 square foot building with a two-story glass foyer.



## ATTACHMENT B

Evidence of violations, from January 1, 2008 to the present, of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of controlled substances outside the usual course of professional practice and without a legitimate medical purpose and conspiracy to unlawfully distribute controlled substances); Title 18, United States Code, Section 1956 (money laundering); and Title 18, United States Code, Section 1347 (Healthcare fraud), as follows:

1.  Patient files (as specified in Attachment C), including but not limited to the complete patient files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, patient sign in sheets, billing records, test results, laboratory tests and results, photographs, x-rays, physician orders, history and physical forms, treatment plans, referrals, consultations, correspondence, patient contracts, patient information, demographic information, and certificates of medical necessity.

2.  Prescription forms that may relate to the crimes under investigation, such as pre-filled or pre-signed prescription forms.

3.  Records reflecting any polices or procedures of the clinic, including but not limited to billing and training policies and procedures.

4.  Records of patient complaints, allegations of substandard care, and unnecessary services performed by representatives, employees and agents of the clinic.

5.  Records related to employees and personnel including but not limited to resumes, application forms, licenses, job descriptions, time sheets, employment agreements, management reviews, hiring records, termination records, contracts, IRS Forms 1099 and W-2, cancelled checks, expense reimbursement documents, and credit card receipts for all current and former clinic owners, officers, employees and independent contractors.

6.  Communications in any form involving current and former clinic owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial services providers, potential or actual patients, insurance companies, or government entities to the extent the communications may relate to the crimes under investigation. This includes communications between any employees of the clinic and the clinic itself and communications between and among any of the entities referred to herein.

7. Audio or video recordings, stored in any format, of communications between, or statements of, current and former clinic owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial service providers, potential or actual patients, security guards, and physical therapists.

8. Contracts with any current or former patients, vendors, affiliates, referral sources, independent contractors, or physical therapists.

9. Records that tend to show the activities, location, or compensation of current and former clinic owners, officers, employees and independent contractors, referral sources, or physical therapists including:

    a. Calendars, schedules, appointment books, timesheets, or address books;

    b. Compensation agreements and payments; or

    c. Documentation related to purchase or other transfer of assets.

10. Corporate records for the clinic, including meeting minutes, strategic planning documents, financial projections and budgets, organizational charts, or other records reflecting corporate decision-making and responsibilities.

11. Financial records reflecting the earnings, income, profits, and assets of the clinic and its owners and corporate officers and directors, including: bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, stock certificates, credit cards, credit card statements, tax returns, tax return information, appraisal documents, title documents, safe deposit box keys, storage facility keys, and documents evidencing account members and financial assets of the clinic and its owners and corporate officers and directors.

12. Cash, money orders, or other forms of payment, stored in any location, which represents proceeds from the illegal conduct described herein.

13. Any and all electronic devices belonging to the clinic, its owners, corporate officers, and directors, including but not limited to David Stein and Sharon Stein, which are capable of analyzing, creating, displaying, converting or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, and other computer related electronic devices. Documents in any format or medium that concern any accounts with an Internet Service Provider.

14. Documents in any format or medium that concern online storage or other remote computer storage, including, but not limited to, software used to access such

online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

15. Items reflecting the use of file-sharing technology (not to include contents of files shared that are not otherwise within the scope of this attachment).

16. Items reflecting the use of remote-working software or capabilities.

17. Items in the paragraphs above that are stored in computer media, including media capable of being read by a computer (such as external and internal computer hard drives, memory sticks, and thumb drives).

18. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises, including, but not limited to, canceled mail, leases, rental agreements, utility and telephone bills, statements, identification documents, and keys.

19. Items of personal property that tend to establish ownership of assets, including, but not limited to, insurance documents, property titles, receipts for purchases of assets.

20. Documents identifying other locations where the clinic may maintain financial, medical, and billing records, such as additional office space or storage units.

## ATTACHMENT C

Patient files and records to be seized related to the following individuals.





